UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KYLENE MARIE MUNN,

               Plaintiff,                    Civil Action No. 12-14832

       v.                             District Judge Julian Abele Cook
                                    Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [14]**
**AND DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Plaintiff Kylene Marie Munn appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 14, 17). For the reasons set forth below, the Court finds that the Administrative Law Judge failed to appropriately weigh a treating medical-source opinion. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 14) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

1

## I. PROCEDURAL HISTORY

On July 2, 2008, Plaintiff protectively filed for supplemental security income asserting that she was unable to work as a result of impairments she was born with, including hearing loss and mental impairments. (*See* Tr. 86, 138, 159.) The Commissioner initially denied Plaintiff's disability application on October 30, 2008. (Tr. 86.) Plaintiff then requested an administrative hearing, and on March 30, 2010, she appeared with counsel before Administrative Law Judge Jacqueline Y. Hall-Keith, who considered her case *de novo*. (Tr. 38–79.) In an October 4, 2010 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 33.) The ALJ's decision became the final decision of the Commissioner on August 31, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review.[1] (Tr. 1.) Plaintiff filed this suit on October 30, 2012. (Dkt. 1, Compl.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

---

1 It appears that a request for Appeals Council review was timely submitted on December 2, 2010, but the Appeals Council did not deny the request until August 2012. (*See* Tr. 80.)

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Hall-Keith applied this framework to Plaintiff's case as follows. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 2, 2008, the application date. (Tr. 27.) At step two, she found that Plaintiff had the following severe impairments: hearing loss, panic disorder without agoraphobia, anxiety, borderline intellectual

3

functioning, and pervasive developmental disorder. (*Id.*) Next, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 27–29.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform unskilled light work as defined in 20 C.F.R. § 416.967(b), except that she was limited to one to two step operations. (Tr. 29.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 31) At step five the ALJ found, based on vocational expert testimony, that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 32.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the date the application was filed through the date of her decision. (Tr. 33.)

## III. THE ADMINISTRATIVE RECORD

### A. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff was 21 years old at the time of the hearing. (Tr. 43.) She testified that she had never worked. (Tr. 44.) She had completed high school, attending special education for all classes all the way through. (Tr. 43, 48.) She said she had particular problems with math, English, science, and social studies, but she was able to read and write English and perform basic math including multiplication and division. (Tr. 44.)

Plaintiff testified that she was taking two classes at a community college, but had not decided whether to pursue a degree. (Tr. 50.) She had completed one semester and received a C in Pre-Algebra (a remedial class) and a B in Academic Literature I. (Tr. 50–51, 58.) At the time

4

of the hearing, she was retaking the math class ("Because my mom just wanted, we wanted more repetition so I understood the concepts better") and taking Academic Literature II, and had Bs in both classes. (Tr. 59.) She received special accommodations in the classes: "we have a recorder where we tape what the teacher says and then, and then I also go down to this office, that is a, the special ed room where I can get help on taking longer tests and, yeah, taking tests." (Tr. 51.) She had a tutor who helped with her papers, but she was able to write them herself, including typing them on a computer. (Tr. 51–52.) She also received help with her writing skills and math at her mother's workplace. (Tr. 59.) Plaintiff's mother worked at a cognitive learning center. (Tr. 69.) Including tutoring, help at her mother's workplace, and homework, Plaintiff said she spent about five hours a day on schoolwork outside of class. (Tr. 59–60.)

Plaintiff said that she was four feet nine inches, and weighed seventy pounds. (Tr. 43.) She testified that she had problems with her hearing that made it difficult for her to hear a teacher when sitting in the back of a classroom. (Tr. 44.) She said she had tried hearing aids but did not like them, although they did help her to hear. (Tr. 45.) When the ALJ asked whether Plaintiff had any other physical impairments, she said yes, but when asked what they were she said she did not know. (Tr. 45–46.) Her counsel told the ALJ "that with the developmental delays that have occurred and the small stature that there are some issues with strength and also stamina. It sounds like she is unable to do much lifting and she does get physically exhausted quite easily." (Tr. 46.) Counsel said that Plaintiff had told her she could not lift more than five pounds. (Tr. 46.)

5

When the ALJ asked Plaintiff about her energy, she said "[s]ometimes I have a lot of energy and sometimes I don't." (Tr. 49.) For example, when doing homework sometimes she would "get exhausted and be tired." (Tr. 49.) She said she sleeps very well. (Tr. 52.)

Plaintiff testified that she got panic attacks once or twice a week for ten to fifteen minutes that made it hard to breathe, caused her heart to race, and made her hands tingle. (Tr. 47.) She said they came on "when it's quiet in the room," or when she is around a lot of people. (Tr. 47–48.) She denied sadness, crying spells, and hearing voices or seeing things that were not there. (Tr. 49.) When asked about self-esteem, she said, "I feel pretty good." (Tr. 52.)

When the ALJ asked about her ability to concentrate, Plaintiff said she could "concentrate to a point." (Tr. 49.) She said her ability to focus and her memory were okay but her ability to remember what she had been told "[n]ot so much." (*Id.*) On questioning by her attorney, Plaintiff said forgetfulness was a problem sometimes, such as with "[s]tuff that my parents tell me to do," but she smiled when she said it and on follow-up questioning by the ALJ she admitted that it was selective. (Tr. 64.)

Plaintiff said she did "almost everything" with her twin sister.[2] (Tr. 52.) She said she was "afraid to do stuff by [her]self." (Tr. 60.) Her sister was taking the same college classes that she was, and she did not think that she could do it by herself. (Tr. 60.) She said she was "just afraid the teachers [we]re going to yell at [her]." (Tr. 60.)

---

2 Munn noted in her motion that her twin, "whose lowest IQ score is only a few points lower . . . , meets the Listing of Impairment criteria for that medical impairment and collects SSI." (Pl.'s Mot. at 3 n.1.)

6

When the ALJ asked Plaintiff whether she did activities with her friends, Plaintiff said "Yes, but I don't do them by myself." (Tr. 52.) Plaintiff's attorney later asked, "How about interacting with other people? I know you're real close with your sister. . . . You do most everything with your sister, right? . . . Do you have any other friends that you visit with?" (Tr. 64.) Plaintiff agreed that she did almost everything with her sister, and said she did "[n]ot really" have other friends. (*Id.*)

Plaintiff testified that she went to movies, out to eat, and bowling. (Tr. 52–53.) She said she went to church every week. (Tr. 53.) She said she played a cooking video game, but she was only able to play "for maybe five or ten minutes." (Tr. 54.) And she said she did not actually cook, other than using the microwave. (Tr. 55–56.) She said she enjoyed drawing and swimming, although she did not swim very often. (Tr. 55.) And she said she played the guitar about two hours a day. (*Id.*) She had a driver's license, but did not drive more than four miles from her house, and rarely drove by herself. (Tr. 55, 61.) She said she was able to put gas in the car, but she only made purchases with a credit card because she had a hard time making correct change with cash. (Tr. 61–62.) Plaintiff said she was able to shower and dress herself, but she often forgot to brush her teeth. (Tr. 61–62, 64.) She occasionally washed dishes and laundry and changed bed linens, but did not vacuum, sweep, mop, dust, take out the garbage, garden, or do any yard work. (Tr. 56–57.) On a typical day, Plaintiff testified that she went to school, came home and made herself lunch, did her homework and "la[id] around the house." (Tr. 57.)

Plaintiff said she was not taking any medications. (Tr. 57.) She said she saw a therapist once a week to "talk about situations that are going on in the house and how [she was] feeling." (Tr. 57.)

### 2. Testimony by Plaintiff's Mother

Plaintiff's mother, Leanna Munn, testified that "Kylene needs the assistance in the way that I believe the type of support I would provide a twelve, thirteen, or fourteen year old," such as being "[r]eminded daily to do certain self care procedures." (Tr. 65–66.) She said, "We live as a family unit but she's very depend[e]nt on our home and the type of supports that we provide." (Tr. 66.) Leanna did not think her daughter would be able to live alone at the time of the hearing. (Tr. 66.) She explained:

> [T]here is not a consistency in the way she p[er]forms things. She needs to be daily reminded to brush her teeth. We have tried to setup situations where she's required to clean up the kitchen. There's, her ability to take care of herself in a way that she could sustain it for a period of time is not there. Even though she knows she's supposed to brush her teeth, she doesn't. We generally take her to the dentist every three months to make sure she has good oral hygiene. Kylene has a problem with also constipation where she's reminded daily to take the steps needed in order to avoid the constipation. So these are just issues that we deal with on a daily or weekly basis that she could not handle herself.
>
> Last Saturday we were in the hospital at the emergency room because she was dehydrated. We went in for constipation and then found out she was dehydrated. So it's just those type of things that occur. She could not have gone to the hospital by herself unless she called 911. Once she got into the hospital she had a very difficult time explaining to the doctor what the problem was. So it just seems to be a series of incidences like those that, where she can't advocate for herself in those situations.

(Tr. 66–67.)

When asked whether Plaintiff could pay bills, her mother said it "potentially would be a problem because her father and I have tried to set up structures in which we ask her for accounting procedures, we ask her to put all her receipts in a box. We ask her to balance her bank account and repeatedly those things do not get done." (Tr. 67.)

Plaintiff's mother testified that Plaintiff could heat prepackaged food in the microwave and make cereal. (Tr. 67.) In terms of cooking, the most she had done was boil pasta. (*Id.*) When Plaintiff's attorney asked whether she thought Plaintiff could follow a recipe, she said, "It would depend on how complex the recipe was. Maybe pancakes, you know, things with two or three, two or three items, four items," but "[s]he could probably only get the right measurement if it was the exact measurement on like measuring cup . . . as far as trying to double something or multiply something that would be very difficult." (Tr. 68.)

Leanna said Plaintiff could not have come to the hearing by herself because "[s]he really only drives four to five miles from our house and she doesn't go on freeways," and "she only goes places where we've taken her before and there's been a repeated route. As far as finding a new environment in this area, no, she could not have followed the directions on MapQuest to get here." (Tr. 69.) She could use public transportation if she did not have to transfer buses. (Tr. 69.) Leanna said Plaintiff was able to use a cellular phone and could text. (Tr. 71.)

Regarding Plaintiff's college classes, Plaintiff's mother testified that "in order to get through her two remedial classes," Plaintiff received help "a minimum of ten to twelve hours a week with one on one support" at the cognitive learning center where Leanna worked, and Plaintiff also had a math tutor at school. (Tr. 69–70.) Plaintiff's mother explained that Plaintiff

"actually got a C minus in the [math] class" and "she actually failed the final and the recommendation is unless you get an A or B in the class you probably should not move on to the next level," so they had her repeat the class "so that the concepts would be more concrete for her." (Tr. 70.) Plaintiff was "doing better the second time around" in the math class, but "the language class is way above her head. She does not have the reading ability to be successful in this language class. The abstract concepts, the deductive reasoning, are just higher than her comprehension at this point." (Tr. 70.) She believed that Plaintiff's reading ability was "solid sixth grade level." (Tr. 70.)

When asked about Plaintiff's ability to perform at a certain pace, her mother said "it seems like she has a limited amount of mental energy"; for example, "if she goes to school for a couple of hours and she goes to tutoring for a couple hours then she goes home and sleeps," and then "she'll get up to eat something, she may watch a couple of TV programs, but she generally is in bed by eight thirty or nine o'clock." (Tr. 71.) She said Plaintiff routinely sleeps two to three hours in the afternoon, in addition to sleeping around ten hours at night; "She's always had a need for high amount of sleep." (Tr. 71–72.)

When Plaintiff's attorney asked what problems might arise if Plaintiff were to attempt simple, unskilled tasks in a job setting, her mother said at a fast food restaurant "[t]he processing and speed at which things occur I don't think would be conducive to her," while at a grocery store "her height inhibits actually a lot of the bagging process. I don't see her pushing carts out in the parking lot because she weighs sixty-nine pounds." (Tr. 72–73.) When the ALJ asked Plaintiff's mother whether they had taken her to Michigan Rehabilitation Services, she said,

10

"[t]hey didn't want to open a case file while we were still in school," and "[s]he's always been in school" because "[w]e always wanted to maximize the academic growth, cause we always felt that they could do better with a higher reading level, higher math skills, higher critical thinking, higher comprehension, so we continue to work on those."[3] (Tr. 73.) Leanna said, when asked by Plaintiff's counsel, that she did not think Plaintiff could function independently in the work world, and "she would need supervision. It would depend on the job, how much she needed." (Tr. 76.)

Plaintiff's attorney asked Leanna to describe Plaintiff's panic attacks: "Well it's been a trying two weeks because we've had a number of them. She just melts down. Is irrational, not to be redundant, but panicky, we can't get her off square one. Last Friday I was at work and she called me ten times in a row." (Tr. 74.) Leanna said Plaintiff was calling because

> she couldn't have a bowel movement and she wanted to know what I would do about it and this was after being in the hospital in the emergency room last, week ago Saturday, and it just seems like that once this comes over her[] she loses all rational thought and ability to talk her down, finding out the problem is, trying to resolve what the problem is, and actually that's why we have her go to a therapist. To try to resolve some of these issues and get to the bottom of why she feels the way she does.

(Tr. 74.)

### 3. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ

---

3 Plaintiff's school records indicated that at her April 2008 Individualized Education Program meeting, Plaintiff's "[p]arent refused MRS services." (Tr. 223.) But a December 2008 IEP Team report indicated "contact to be made with MRS (possible voc. eval.) . . . By 1/09." (Tr. 340.)

asked about job availability for an individual with a high school education in special education who was taking classes at a community college, did not have difficulty with communication, and had a residual functional capacity to perform unskilled, light work. (Tr. 77.) The VE said "there would be positions such as usher, ticket taker, house keeper, hostess, greeter, and baby sitting. . . . about 8,000 such jobs in the metropolitan area, about 15,000 in the state." (Tr. 77.) When the ALJ asked about jobs in the manufacturing setting with "simple, one, two step type of operations," the VE said there would be "packaging, sorting, inspection, and assembly" jobs available, "about 9,000 such jobs in the metropolitan area, about 15,000 in the state." (Tr. 77–78.) If the exertional level were changed to unskilled sedentary, the VE said "[t]hat would again, involve typically bench type operations, . . . about 6,000 in the metropolitan area, about 11,000 in the state." (Tr. 78.) In the service industry, there would be "gate tender, badge checker, surveillance monitor, information clerk. About 4,000 in the metropolitan area, about 7,000 in the state." (Tr. 78.)

Plaintiff's attorney asked the VE, "if a person were limited to simple, unskilled jobs but they needed special supervision would that take them out of the competitive job environment?" (Tr. 78.) The VE said, "More than likely, yes." (*Id.*) The attorney followed up, "So we're talking about a requirement of special supervision is really limiting to like a sheltered work shop or a job co[a]ch situation, maybe?" (Tr. 79.) The VE responded, "I would say, yes." (*Id.*)

## B. Medical Records—Physical

Plaintiff and her twin sister were born prematurely at 34 weeks. (Tr. 428.) Plaintiff weighed three pounds, two ounces, and was hospitalized for five weeks after her birth. (*Id.*) She

was slow to develop from birth (Tr. 191) and by at least January 1991, when Plaintiff was two and a half, she was diagnosed with developmental delay (Tr. 442).

In November 1997, when Plaintiff was nine years old, she was evaluated by optometrist Bethany Lewallen. (Tr. 443–45.) Her vision was 20/20 in both eyes, but her results on some tests were below expectations for her age, and an "[e]ye teaming evaluation revealed that Kylene's eyes were "not working together as an efficient team," and instead had "a tendency to turn out," which "may result in a compensatory head turn or tilt, double vision, frequent loss of place when reading, headaches, eyestrain, and/or inability to sustain at a visual task." (Tr. 444.)

The following month, Plaintiff was evaluated at the Pediatric Otolaryngology Clinic at the University of Michigan C.S. Mott Children's Hospital. (Tr. 207–208.)  Marci M. Lesperance, M.D., noted her history of "recurrent otitis media status post bilateral myringotomy with tube placement, adenoidectomy, and cauterization of interior turbinates at 5 years of age," with no further episodes of otitis since the surgery. (*Id.*) Based on an audiogram and physical examination, Dr. Lesperance's impression was "mild-to-moderate conductive hearing loss, probably of syndromic etiology." (*Id.*)

In March 1998, Plaintiff was evaluated at the University of Michigan Pediatric Genetics Clinic. (Tr. 428.) Her height, weight, and head circumference were all less than the fifth percentile for her age. (Tr. 429.) Stephen B. Gruber, M.D., Ph.D., indicated that she had many features of Russell-Silver Syndrome, a delayed growth syndrome, but not enough to make a firm diagnosis. (*Id.*) Speaking of both Plaintiff and her sister, Dr. Gruber wrote that "the x-rays show that their bony growth is delayed relative to their chronological age." (*Id.*) But he was not able to

13

identify a specific cause for Plaintiff's and her sister's growth and developmental delay. (*Id.*) He noted that blood tests had "excluded a number of possibilities including a chromosomal abnormality, fragile X syndrome, or thyroid problem." (*Id.*)

In December of the same year, when Plaintiff was ten years old, she was evaluated by a pediatric endocrinologist, Dr. Floyd L. Culler, at the University of California, Irvine. (Tr. 191.) In describing Plaintiff's and her sister's medical history, Dr. Culler noted that they "have not had major health setbacks," but "[e]valuation at the University of Michigan has shown mild conductive hearing loss, [and] significant bone age delay of approximately 2-1/2 years." (*Id.*) A study taken as part of Dr. Culler's examination put their bone age at eight-and-a-half, two years behind their chronological age. (*See* Tr. 192, 193.) Dr. Culler noted that pediatric endocrinologists at the University of Michigan considered the diagnosis of Russell-Silver syndrome, but he said, "I do not see clinical stigmata of Russell-Silver syndrome myself." (Tr. 192.) His assessment was dysmorphic syndrome, characterized by extreme short stature. (*Id.*)

In January 2006, Plaintiff was evaluated by an allergist, Linda R. Bolton, M.D. (Tr. 426.) Dr. Bolton's impression was: "[n]asal congestion and I doubt allergy as a contributing factor. I question nasal or sinus structure as etiology." (*Id.*) She also noted during the examination that Plaintiff had "a grade II/VI systolic murmur, which radiates to the back." (*Id.*)

The heart murmur was again noted during a routine physical by Dr. Steve Kallabat at Internal Medicine & Pediatrics of Bloomfield in August 2009. (Tr. 389.) Dr. Kallabat wrote that it was a "new onset" of the murmur, and ordered an echocardiogram to evaluate it and "assess for coarctation of aorta." (*Id.*) The echocardiogram was taken in September 2009 by cardiologist

14

Muhammad Asim Munir. (Tr. 391.) Dr. Munir wrote that Plaintiff was tachycardiac during the study but had "[n]ormal left ventricular size with normal wall thickness and normal systolic function," with "ejection fraction 70%," "[h]yperdynamic left ventricle," and "[n]ormal diastolic function." (*Id.*)

### C. Medical Records—Psychiatric

Plaintiff began treatment with psychiatrist Al Garmo on January 21, 2010, according to a questionnaire submitted to Dr. Garmo by Plaintiff's attorney. (Tr. 452.) Dr. Garmo completed the questionnaire on February 27, 2010. (Tr. 455.) On the questionnaire, Dr. Garmo provided that his diagnosis was panic disorder without agoraphobia, and he also noted her history of cognitive impairment or dysfunction. (Tr. 452.) Dr. Garmo wrote that Plaintiff  was "working in psychotherapy and is considering medication," and that her prognosis was "fair to guarded for her anxiety." (*Id.*) He indicated that she met the following criteria for Listing 12.06 (anxiety-related disorders): generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance or scanning; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; and resulting marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 453–54.) Dr. Garmo wrote that "per history," her condition first met these criteria "6 years ago." (Tr. 454.)

Dr. Garmo indicated that Plaintiff had "extreme impairment of ability to function over a sustained period of time" in her ability to "[u]nderstand, remember, and carry out an extensive

15

variety of technical and/or complex job instructions." (*Id.*) Her impairment was "marked" ("seriously affect[ed] . . . ability to function") in the following abilities: "understand, remember and carry out detailed but uncomplicated job instructions," and "simple one or two-step job instructions," "[i]nteract appropriately with supervisors and supervisory demands" as well as "co-workers in a competitive job setting," "[d]eal appropriately with the public," "[m]aintain sustained concentration and attention," "[r]espond appropriately to customary work pressures five days a week in a routine work setting," and "[t]ravel unaccompanied outside of [her] immediate living environment." (Tr. 454–55.) Dr. Garmo also indicated that Plaintiff had "moderate" impairment ("[i]mpairment which imposes more than marginal but less than serious [e]ffect on the ability to function") in her ability to "care appropriately for []her own grooming and hygiene" and to "[i]nitiate and participate in activities required for daily living outside the home (e.g., going shopping, using a post office or taking public transportation)." (*Id.*) He indicated that she would likely experience decompensation "under the stress of a competitive full time job in a non-sheltered environment," and that her mental impairment and treatment would cause her to be absent from work five times a month or more. (Tr. 455.)

The administrative record before the ALJ also included treatment notes from Dr. Garmo for five 45-minute sessions between January 21, 2010, and February 25, 2010. (Tr. 446–51.)[4] Dr. Garmo's diagnosis throughout the period remained consistent: panic disorder without

---

4 Dr. Garmo's treatment notes from March 11, 2010, to September 28, 2010, (Tr. 456–79) were submitted to the Appeals Council after the ALJ issued his decision. (Tr. 5.) Because this evidence was not part of the administrative record before the ALJ, the Court does not consider it for purposes of this appeal. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996).

agoraphobia, generalized anxiety disorder, cognitive dysfunction secondary to developmental disorder, and pervasive developmental disorder. (*See id.*) On February 4, 2010, Dr. Garmo wrote:

> It is becoming more clear she has recurrent unexpected panic attacks consisting of sweating, shaking, fear of stopping breathing, and nervousness. These occur while awake and awaken patient from sleep. They can occur once or twice weekly out of the blue and last about 15 minutes. She has had these since about age 16 years old according to patient.

(Tr. 448.) On February 18, he noted that she had two panic attacks since her last visit on February 4. (Tr. 447.) On February 25, he wrote: "Patient with anxiety in session. She reports near panic attacks in the last week, however, was able to avoid full blown symptoms." (Tr. 446.)

Dr. Garmo apparently recommended Buspar or a serotonin reuptake inhibitor to treat Plaintiff's anxiety symptoms, as he repeatedly noted that Plaintiff would "consider" it. (*See id.*) On February 18 and again on February 25, he wrote: "we discussed option of medication which she is still considering, however, very reluctant." (Tr. 446, 447.) In each session note, Dr. Garmo also recommended continuing cognitive behavioral therapy to address her panic attacks and anxiety. (*See* Tr. 446–51.)

### D. Educational Records and Cognitive Testing

The administrative record includes extensive documentation of cognitive testing and other assessments from Plaintiff's schooling, beginning in kindergarten. The Court summarizes

17

only the more recent records here.

In April 2006, Bloomfield Hills school psychologist Ronda Pretzlaff Diegel, Ph.D., and a teacher consultant administered the Wechsler Adult Intelligence Scale (WAIS-III), Woodcock-Johnson Psycho-Educational Batter Tests of Achievement (WJ-III), and adaptive behavior inventories to assess Plaintiff's progress and needs in the special education program. (Tr. 249.) Plaintiff was 17 years old and in the tenth grade. (Tr. 249, 251.) On the WAIS-III, Plaintiff's verbal IQ was 75, performance IQ was 85, and full-scale IQ was 78. (Tr. 252.) On the WJ-III, her scores in reading were equivalent to those of an eighth grader; in written language to a sixth or seventh grader; in oral expression and listening comprehension to a sixth grader; and in math to a fourth or fifth grader. (Tr. 254.) Dr. Diegel concluded that Plaintiff was functioning within the borderline range of intelligence with significantly lower achievement in the area of math calculation. (Tr. 256.) Her reading and writing were "commensurate with her cognitive ability," and her overall adaptive behavior was "within the average range, although some concerns emerged regarding her functional academic skills." (*Id.*)

A Speech Language Pathologist, Beth Winneg Levy, evaluated Plaintiff's speech and language performance for the Bloomfield Hills Schools Individual Multidisciplinary Team in April and May 2006. (Tr. 245.) Levy noted that Plaintiff had received speech and language support since her arrival at Bloomfield Hills Schools in seventh grade. (*Id.*) Plaintiff scored in the broad average range in listening comprehension and oral expression on the Oral and Written

18

Language Scales, but her core composite language score on the Comprehensive Assessment of Spoken Language was in the below average range. (Tr. 248.)

On May 15, 2006, certified rehabilitation counselor and vocational evaluation specialist Kathleen M. Bedard evaluated Plaintiff's sensory, motor, emotional/behavioral, and adaptive behavior skills and provided an individualized trait analysis. (Tr. 395.) According to her report, Plaintiff was

> functioning within the Transitional Work Training/Vocational Adjustment range. This is described as "Work behavior and job readiness skills necessary for community employment are emphasized at this level; vocational exploration and job training activities are undertaken; functional academics continue depending on need; traditional vocational rehabilitation services are preferred."

(Tr. 403.)

School psychologist Dr. Diegel administered the Wechsler Nonverbal Scale of Ability ("WNV") for Plaintiff on November 27, 2006, at the request of Plaintiff's parents "as an addendum to the comprehensive re-evaluation conducted in April 2006." (Tr. 238.) Plaintiff was then eighteen years old and in the eleventh grade. (Tr. 240.) According to the report, "[t]he purpose of the WNV is to expand the clinical utility of the Wechsler scales to individuals who can be difficult to assess because of language constraints." (Tr. 239.) Plaintiff's full-scale score on the WNV was 82, the 12th percentile, which was consistent with her April 2006 scores. (Tr. 239–40.)

19

In March 2007, Plaintiff took the Michigan Merit Examination ("MME") for eleventh-grade students, a measure of knowledge and skills based on the state curriculum standards. (Tr. 382.) In mathematics, science, reading, and "Total English Language Arts," her performance level on a scale of one to four was four, indicating that her "performance is not yet proficient and indicates minimal understanding and application of key curriculum concepts defined for Michigan students." (*Id.*) In Social Studies and writing her performance level was three, which is described as "not yet proficient, indicating a partial understanding and application of key curriculum concepts defined for Michigan students." (*Id.*) The ACT was administered as part of the MME. (*Id.*) Her ACT composite score was 12 out of a possible 36, which put her in the first percentile among Michigan students and the second percentile nationally. (Tr. 386.)

A "Social Work Update" on April 11, 2008, from Bloomfield Hills Schools social worker Cassandra Jones, reported that Plaintiff "does struggle with demonstrating self-advocacy when necessary." (Tr. 219.) She typically required "one or two prompts," and "require[d] assistance in developing a plan to inquire on desired information." (*Id.*) Jones wrote that Plaintiff was "receiving social work support on a one and one basis as well as in group settings," with other students in the Academic Resource Program, and that she was doing "well in the group settings" and seemed "comfortable interacting with her peers in this setting." (*Id.*)

A report on Plaintiff's "Present Levels of Achievement and Functional Performance" for her April 2008 Individualized Education Program ("IEP") indicated that Plaintiff was in the 12th

grade but planning to attend a fifth year of high school. (Tr. 221.) The report stated that she had a specific learning disability in the area of math calculation. (*Id.*) She demonstrated "difficulties in auditory and reading comprehension in the areas of vocabulary knowledge and implied meaning" and "in verbal and written expression for sequencing details from paragraph length material." (*Id.*) She also needed "to increase her independence and appropriately demonstrate self-advocacy when necessary." (*Id.*) She was attending Directed Study in the Academic Resource classroom and Math and Language in the Learning Resource classroom, as well as four general education classes with modifications including a paraprofessional; extended test time; modified tests, grades, and assignments; and alternative test settings. (*Id.*) The April 2008 IEP provided that those modifications would continue, and that she would receive four to eight hours of assistance one time per week in the Specific Learning Disability Program, four to eight hours one time per week in the Learning Resource Center, 15 to 20 minutes two to three times per month of social work services, and 45 to 60 minutes six to eight times per month of speech and language services. (Tr. 224, 229.)

On July 22, 2008, Plaintiff's special education teacher, Kerry Kerly, completed a Social Security Agency ("SSA") "Teacher Questionnaire." (Tr. 311–18.) She wrote that she had known Plaintiff for approximately four years, and saw her an hour to an hour and a half per day for "Academic Resource Support." (Tr. 311.) Kerly indicated that Plaintiff had problems functioning in five of the six domains: acquiring and using information, attending and

completing tasks, interacting and relating with others, caring for herself, and health and physical well-being; but not moving about and manipulating objects. (Tr. 312–17.)

In the domain of acquiring and using information, Kerly rated three of ten activities as five out of five or "a very serious problem" for Plaintiff; the other seven she rated four out of five or "a serious problem." (Tr. 312.) She wrote, "At times, Kylene has difficulty with listening comprehension (WJIII, GE 6.2, 4/28/08) and prefers the assistance of visual aids. Kylene has difficulty with content vocabulary at her grade level. She also is very reluctant to participate verbally in the general education setting, especially in class discussion." (*Id.*) In the domain of attending and completing tasks, Kerly rated one of thirteen activities as a serious problem: completing work accurately without careless mistakes. (Tr. 313.) She wrote: "At times, Kylene has difficulty carrying out tasks with multi/single step directions and needs a reminder or visual aid. . . . Kylene makes careless mistakes regularly in writing & basic math facts." (*Id.*) In the domain of interacting and relating with others, Kerly rated three of thirteen activities as a serious problem: relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. 314.) She wrote: "Kylene does not usually pursue friendships with students in the gen. ed. setting. She can be extremely quiet and has difficulty advocating for herself in many social/academic situations." (*Id.*) In the domain of caring for herself, Kerly rated one activity, identifying and appropriately asserting emotional

needs, as three out of five or "an obvious problem." (Tr. 316.) She wrote, "At times, Kylene does not appear to use deodorant or chapstick when needed. She also has difficulty advocating for herself & asserting herself when necessary." (*Id.*) For the domain of health and physical well-being, Kerly wrote, "Though Kylene has been identified with mild to moderate hearing loss of low frequency sounds, she does not choose to use hearing aids or an FM system." (Tr. 317.)

Melora J. Ostheim, a Speech Language Pathologist at Plaintiff's high school, completed an SSA "Speech and Language Questionnaire" on September 4, 2008. (Tr. 261–62.) She indicated that Plaintiff had delayed expressive and receptive language. (Tr. 261.) Specifically, Ostheim wrote:

> Receptive language is impaired in the areas of comprehension of lengthy & complex concepts, lectures, directions. She has challenges in understanding and using multiple meaning words, proverbs, idioms, similes and metaphors. Expressively Kylene has difficulty clearly expressing ideas due to limitations in use of correct syntax, word order and grammar.

(Tr. 261.) Because of these problems, Plaintiff "need[ed] assistance when completing classroom assignments" and "modifications to the content of her classes, assignments, and the time in which to complete assignments." (*Id.*) Ostheim indicated that Plaintiff's language skills were equivalent to those of a 13-year-old. (*Id.*) She noted that although Plaintiff did not have a stutter, "[s]he often pauses, and revises her statements in a manner that makes it appear like stuttering." (Tr. 262.)

23

At the request of Plaintiff and her parents, Plaintiff's intermediate school district provided a consultation in July and September 2008 regarding her academic progress and how it could be increased. (Tr. 319.) The consultation team consisted of a speech and language consultant, behavior and learning consultant, and educational consultant. (*Id.*) They reviewed Plaintiff's prior assessments and evaluations, obtained teacher input, observed and assessed Plaintiff, and wrote a report and recommendations. (*See* Tr. 319–30.) Plaintiff was twenty years old and a fifth-year senior in high school at the time. (*See* Tr. 319, 321.) The "Problem Analysis" section of the consultation report stated:

> Kylene's hearing and language impairment impacts her ability to listen to lectures and/or directions, retain and comprehend what is said and retell the information. Kylene requires directions and instructions provided to her in approximately 5 word chunks in order to optimize her comprehension, understanding, and retell. In addition, Kylene's capacity for new information is less than expected for her age. She can learn approximately 5 new bits of information at one time and requires approximately 45 repetitions to place new information in her long-term memory.
>
> In reading, Kylene's word study and fluency strength can mask her underlying difficulty with word meaning. Kylene's difficulty with word meaning can interfere with her comprehension of the text she can so fluently read. Comprehension can be increased using peer checklists, teaching unknown word meanings, and assessing with visual referent and forced choice formats. In mathematics, Kylene requires additional modeling, guided practice, and feedback on multi-digit by multi-digit multiplication, fractions, decimals, and long division. Kylene also requires mastery of the language of mathematics, especially the word meaning of mathematical terms. In writing, Kylene requires additional modeling, guided practice, and feedback on punctuation, sentence structure, and grammar as

24

> well as use of transition statements and elements of report writing.
> Kylene would benefit from an outcome-based approach to
> [illegible] writing in which she can turn her work in over and over
> again until it meets the standard of excellence expected in her
> courses and where she can use visual organizers for thoughts.

(Tr. 321–22.) The consultants made detailed recommendations for Plaintiff's continued special

education and supportive services. (*See* Tr. 322–23.)

On October 9, 2008, licensed psychologist Sally Bloch, Ph.D., evaluated Plaintiff. (Tr.

274–83.) She reviewed Plaintiff's records and administered the WAIS-III and the Vineland

Adaptive Behavior Scales (Vineland-II). (Tr. 274.) On the WAIS-III, Plaintiff's verbal IQ was

74, performance IQ 83, and full-scale IQ 76. (Tr. 277.) This put her cognitive ability in the

borderline range of intellectual functioning, or the fifth percentile. (*Id.*) Her working memory

index was borderline, at 71, and her processing speed index was in the average range, at 93. (Tr.

281.) Dr. Bloch commented, "[s]ignificant memory weakness [is] indicated by her performance

on the auditory working memory task." (*Id.*) Plaintiff's Vineland-II results, which were based on

information reported by her mother, indicated that her communication, daily living, and

socialization skills were in the "moderately low" range. (Tr. 279–81.) Dr. Bloch concluded that

"[o]n the basis on present and past test results, developmental history, and adaptive functioning,

the diagnosis of *317 Mild Mental Retardation* is warranted." (Tr. 282.) She explained:

> The threshold for mental retardation is typically set at 70, and
> experts generally agree that scores of 71–75 are consistent with
> mental retardation when significant deficits in adaptive behavior
> are present (Szymanski & King). In addition, there must be

25

> significant impairment in two or more of the following adaptive
> skill areas: communication, self-care, home living, social skills,
>
> community use, self-direction, health and safety, functional
> academics, leisure, and work (DSM-IV).

(Tr. 281.)

School psychologist Dr. Diegel completed an SSA "Request for Administrative Information" on September 4, 2008, regarding Plaintiff. (Tr. 236–37.) Dr. Diegel indicated that Plaintiff "was eligible for special education services as a cognitively impaired student until her 2006 re-evaluation," when she obtained a full-scale IQ score of 78 "with a significant ability/achievement discrepancy in the area of mathematics." (Tr. 237.) Plaintiff's classification was changed from "Mental Retardation/Mentally Impaired/Intellectually Limited" to "Specific Learning Disability, Math Calculation (3rd [percent]ile)." (Tr. 236.) This is confirmed by a May 2006 "Multidisciplinary Evaluation Team Summary" from Bloomfield Hills Schools, also in the record. (Tr. 244.) Dr. Diegel wrote that although Plaintiff's math score was "the only statistically significant discrepancy," Plaintiff "also struggle[d] with auditory and reading comprehension in the areas of vocabulary knowledge and implied meaning." (Tr. 237.)

Plaintiff's IEP Team met on November and December 2008 to review and revise her IEP in light of the July/September 2008 intermediate school district consultation report. (Tr. 338.) The revised IEP included all previous modifications and supports with some additions including "as needed consultation for reading comprehension assistance" from the intermediate school

district. (Tr. 342.) Plaintiff was to receive services three to four hours per week through the Academic Resource Program, 12 to 16 hours per week in the Secondary Level Resource Room, 60 to 90 minutes per week from Speech and Language Services, and 15 to 30 minutes once or twice per week from Social Work Services. (Tr. 349.) Plaintiff's graduation was planned for June 2008. (*Id.*)

On December 9, 2008, Dr. Bloch again saw Plaintiff, "for an educational assessment to monitor academic progress." (Tr. 331.) Dr. Bloch administered the WJ-III tests of achievement. (*Id.*) She concluded:

> Kylene's English oral language skills (oral expression and listening comprehension) are low average when compared to others at her age level. Her academic knowledge and skills are low to low average. Her overall level of achievement is low average. Kylene's fluency with academic tasks is low average. Her ability to apply academic skills is low.
>
> When compared to others at her age level. Kylene's performance is low average in broad reading, basic reading skills, reading comprehension, math calculation skills, and written expression; and low in math reasoning and basic writing skills.

(*Id.*)

**D. DDS Consultants**

At the request of Michigan's Disability Determination Services ("DDS"), the state agency that helps the SSA evaluate claimants, psychiatrist Thomas T.L. Tsai completed a Psychiatric Review Technique for Plaintiff on October 15, 2008. (Tr. 284–97.) Based on a

27

review of records, Dr. Tsai indicated that Plaintiff had a learning disorder (Tr. 288) and that the listing criteria for Listing 12.05, mental retardation, was not met (Tr. 294). Specifically, he indicated that her degree of functional limitation was moderate in two areas (difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace), and mild in one area (restriction of activities of daily living), with no extended episodes of decompensation. (Tr. 294.) Dr. Tsai did not indicate that he considered any other medically determinable impairments, including anxiety-related disorders. (*See* Tr. 284–93.)

Dr. Tsai also completed a Mental Residual Functional Capacity Assessment, also on October 15, 2008. (Tr. 298–301.) He indicated that Plaintiff was moderately limited in six functional areas (ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to respond appropriately to changes in the work setting) and not significantly limited in fourteen other functional areas. (Tr. 298–99.) He wrote: "Although the claimant has moderate limitations relative to understanding and remembering detailed instructions, maintaining concentration and would require some special supervision, the claimant is capable of a wide range of unskilled tasks." (Tr. 300.)

Speech and Language Pathologist Michele Bridges, M.A., analyzed Plaintiff's case file for DDS on October 15, 2008. (Tr. 310.) She noted some limitations, including difficulties with "lengthy and complex concepts, lectures and directions," "multiple meaning words, abstract lang[uage]," and "[c]orrect syntax use," and speech that sounded like stuttering because of "pauses and revisions," but concluded that Plaintiff's "speech and Lang[uage] skills [were] strong enough to obtain some type of lower skilled work." (*Id.*)

DDS consultant B.D. Choi, M.D., relied on Bridges' assessment when he completed a Physical RFC Assessment for Plaintiff on October 23, 2008. (Tr. 302–309.) He indicated that her hearing was limited but speaking was not, and she must avoid concentrated exposure to noise. (Tr. 306.) He indicated that she had no exertional, postural, manipulative, or visual limitations. (Tr. 303–305.)

**IV. STANDARD OF REVIEW**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve

conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## V. ANALYSIS

Plaintiff makes four arguments in support of reversal or remand: (1) the ALJ erred by failing to find that she met or equaled the criteria of any listed impairment; (2) the ALJ erred by failing to give appropriate weight to the opinions of her treating psychiatrist, Dr. Garmo; (3) the ALJ erred in analyzing the credibility of testimony by Plaintiff and her mother; and (4) the ALJ erred by relying on the vocational expert's testimony because the hypothetical question posed to the expert failed to incorporate all of Plaintiff's substantially supported impairments. (Pl.'s Mot. at 21–31.) The Court turns first to Plaintiff's argument that the ALJ erred by failing to give appropriate weight to the opinions of her treating psychiatrist, Dr. Garmo.

The Commissioner argues that the ALJ "reasonably concluded that Dr. Garmo's opinion was entitled to little weight because he treated Plaintiff for around one month when he issued it and his conclusions were inconsistent with the record as a whole." (Def.'s Mot. at 13.) She notes that under the regulations, "the longer a treating source has treated you and the more times you have been seen by that source, the more weight we will give to the source's medical opinion," and cites cases from this district in which, she says, courts "upheld an ALJ's decision to discount a treating physician's opinion were, as here, it was issued within a month of a claimant starting treatment." (Def.'s Mot. at 13–14 (citing 20 C.F.R.§ 416.927(c)(2)(i); *Street v. Comm'r of Soc.*

*Sec.*, 390 F. Supp.2d 630, 639 (E. D. Mich. 2006); *Render v. Comm'r of Social Sec.*, No. 12–10537, 2012 WL 6932154, \*7 (E. D. Mich. Nov. 27, 2012); *Collins v. Comm'r of Soc. Sec.*, No. 10–15000, 2012 WL 899348, \*4, 10 (E. D. Mich. Feb. 21, 2012); *Morris v. Comm'r of Soc. Sec.*, No. 11-10395, 2011 WL 6371094, \*9 (E. D. Mich. Nov. 18, 2011).)

The Commissioner does not argue that Dr. Garmo was not a treating medical source at the time of his opinion, but the Court must address the issue. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("Before determining whether the ALJ violated *Wilson* by failing to properly consider a medical source, we must first classify that source as a 'treating source.'"); *Kornecky*, 167 F. App'x at 506 ("The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion*."). Indeed, two of the cases the Commissioner cites appear to rest their decision on this basis. *See Street*, 390 F. Supp. 2d at 639 ("the decision notes that Dr. Dotson, who made his findings the same month that he began seeing him, could not be accorded the deference given to a treating physician"); *Render*, 2012 WL 6932154, at \*7 ("As the ALJ reasonably found, the record lacks evidence that a treating relationship existed between Render and Dr. Mir prior to the completion of the medical examination report.").

A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith*, 482 F.3d at 876 (citing 20 C.F.R. § 404.1502). A physician seen

infrequently can be a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.* The case law is clear that one examination is generally not sufficient, but two is a closer issue. *See Kornecky*, 167 F. App'x at 507 ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). In *Smith v. Commissioner or Social Security*, the Sixth Circuit determined that a doctor was not a treating source where he "examined Smith, completed a medical report, prescribed and refilled back pain medication, and denied additional medication when Smith returned seeking more." 482 F.3d at 876. The court reasoned that those contacts "fail to evince the type of ongoing treatment relationship contemplated by the plain text of the regulation." *Id.* The regulation provides that the opinion of a treating source should be given more weight because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, at the time Dr. Garmo rendered his opinion, he had seen Plaintiff five times, for 45 minutes per session, over the course of five weeks. (*See* Tr. 446–51.) This is sufficient to

establish the "ongoing treatment relationship" that the regulations and case law describe as deserving of deference. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The next step is to determine whether Dr. Garmo's opinion is due controlling weight. The opinion of a treating physician must be given controlling weight if it is well-supported and not inconsistent with the record. *See* 20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Rogers*, 486 F.3d at 242; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ stated: "The opinions of Dr. Garmo are given little weight because he had treated the claimant for an extremely limited period of time and his findings are inconsistent with the records as a whole." (Tr. 31.) Plaintiff argues that "[t]he length of the treatment relationship is not material to a determination as to whether a treating medical opinion should be controlling; it is properly considered only if the opinion is not entitled to controlling weight and the adjudicator must determine how much weight it is entitled to be given." (Pl.'s Mot. at 26.3) Viewing the ALJ's opinion with deference, however, she arguably found that Dr. Garmo's opinion was not well-supported because he had treated Plaintiff for only five weeks. Thus the ALJ's decision not to give controlling weight to Dr. Garmo's opinion complies with the first step of the treating source rule.

But, proceeding to the second step, even if it is not given controlling weight, the opinion of a treating physician is subject to a rebuttable presumption of deference. *See* 20 C.F.R. § 416.927(c)(2); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. To

34

rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. This includes demonstrating that he considered the non-exhaustive list of factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *See Rogers*, 486 F.3d at 242 ("When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."); *see also Wilson*, 378 F.3d at 544; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. In fact, the requirement to provide "good reasons" for the weight assigned to a treating-source opinion is a substantial procedural right, abridgement of which warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

Again giving the ALJ's opinion deference, she arguably applied these factors to rebut the presumption of deference to Dr. Garmo, finding it was due little weight because of the length of the treatment relationship and because of inconsistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c). But her analysis ended there, with a conclusory statement. The ALJ did not provide any specific examples of inconsistency with the record as a whole, and this court cannot undertake such analysis *de novo*. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's

opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."). Where there is no substance to be evaluated, there is no way for this court to evaluate whether the ALJ has complied with the treating source rule. *See Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order.").

The ALJ did state "[b]y way of summary," that the residual functional capacity assessed was "supported by the record, when considered as a whole, and especially in light of the treatment records and examination reports, the opinions of Dr. Tsai and Dr. Choi, and the claimant's daily activities." (Tr. 31.) This is a step toward specificity, but still too vague for evaluation. She does not point to which portion of the treatment records and examination reports, among three hundred pages of such records, are inconsistent with Dr. Garmo's opinion. Nor does she identify which of Plaintiff's daily activities are inconsistent with Dr. Garmo's opinion.

It is clear enough that Dr. Garmo's opinion is inconsistent with Dr. Tsai's; for example, Dr. Garmo found that Plaintiff was markedly impaired in activities of daily living, social functioning, and concentration, persistence, and pace (Tr. 453–54), while Dr. Tsai found she was moderately impaired in social functioning and concentration, persistence, or pace, and mildly impaired in activities of daily living (Tr. 294). But Dr. Tsai did not have a treating relationship; indeed, he never met Plaintiff, except through his review of her records. Moreover, because his

opinion was provided in October 2008, his view of the administrative record—which extends another two years—was far from complete. Most notably, he did not review Dr. Garmo's opinion and treatment notes. In fact, he appears not to have considered Plaintiff's panic disorder without agoraphobia, although the ALJ found it was a severe impairment. (*See* Tr. 289, 298). It is far from clear why his opinion should outweigh Dr. Garmo's. *See* SSR 96-6p, 1996 WL 374180, at *2 ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."); *Gayheart*, 710 F.3d at 375 ("an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')."); *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.").

As for Dr. Choi, his opinion was limited to Plaintiff's physical impairments, and therefore the Court fails to see how it conflicts with Dr. Garmo's. (*See* Tr. 302–309.)

In addition, the ALJ failed to address the other factors that weigh in favor of Dr. Garmo's opinion: in terms of frequency, he saw Plaintiff weekly; in terms of the nature and extent of the relationship, he sat and talked with her for 45 minutes each time he saw her, in the context of a treatment relationship expected to continue weekly for an indefinite term; in terms of supportability, his detailed treatment notes were in the record; and in terms of specialization, he was a psychiatrist. *See id.*

Overall, the ALJ's failure to provide good reasons for giving little weight to Dr. Garmo's opinion violates the procedural aspect of the treating source rule, and requires remand. *See Rogers*, 486 F.3d at 243. *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. Even were Dr. Garmo not a treating source, he was at least an examining source with an uncommon familiarity with Plaintiff, and an ALJ must always provide enough explanation for a reviewing court to understand how he or she reached the disability determination. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 518 (6th Cir. 2011) (reversing where the ALJ failed to discuss his reasons for rejecting an examining doctor's opinion in favor of a non-examining doctor's opinion on a key issue). The ALJ has not done so here.

Plaintiff's other arguments, that the ALJ erred in failing to find that she met or equaled the criteria of a listed impairment, in evaluating her and her mother's credibility, and in relying on the vocational expert's testimony, depend in part on the weight due Dr. Garmo's opinion.

Because the ALJ's findings on those issues may change after Dr. Garmo's opinion is reevaluated on remand, the Court recommends denying Plaintiff's other claims of error as moot.

## VI. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that the Administrative Law Judge failed to appropriately weigh a treating medical-source opinion. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 14) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VII. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be

served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  February 3, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 3, 2014.

s/Jane Johnson
Deputy Clerk